UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

VS.                                    CRIMINAL NO. 3:22CR36TSL-FKB

THOMAS W. DOUGLAS, JR. AND JOHN S. WELCH            DEFENDANTS

MEMORANDUM OPINION AND ORDER

This cause is before the court on the government's Motion
in Limine Regarding the Admission of Laboratory Analyses of
Samples Downstream of and Transported from Defendants'
Industrial Facility (Dkt. 124) and defendant Thomas W. Douglas'
Motion in Limine to Exclude Waypoint Lab Reports and Mississippi
Department of Environmental Quality Lab Reports (Dkt. 141).  The
parties have had ample opportunity to argue their positions on
these motions and the court has now reviewed and considered
their submissions, written and oral.

Defendants in this case are charged with violations of the
Clean Water Act relating to alleged illegal discharges of
industrial waste from the Gold Coast Commodities (GCC)
industrial facility in Brandon, Mississippi into the Brandon
sewer, which is part of the Jackson Water Treatment System
(JWTS), operated by the City of Jackson.  Thomas Douglas is
GCC's part owner and president, and defendant John Welch is the
plant manager.

1

The government filed its motion in June 2023, seeking admission of laboratory results from analyses by MDEQ and Waypoint of samples of effluent taken from various locations on or near GCC's facility.  The government argues in its motion that these laboratory "results are evidence of the central allegations in the Indictment, that the defendants, knowingly, surreptitiously, and illegally discharged industrial waste into JWTS ... The laboratory reports contribute to proof that the waste the defendants knowingly discharged into JWTS ... was industrial waste, not domestic waste and was, therefore, subject to the regulations defendants are charged with violating."

The government did not identify in its motion the specific lab reports to which its motion is directed and the government's responses to inquiries by the court on this issue have been inconsistent.  The court, however, considers the list of Waypoint and MDEQ lab reports set out in the government's January 31, 2024 supplemental brief to be the definitive list of lab reports that are the subjects of the pending motions.  This includes Waypoint lab reports commissioned by the City of Brandon on October 5, 6 and 7, 2016, and a single MDEQ report of

a single sample taken by MDEQ on October 27, 2017 from a manhole at Rebel High Velocity Sewer Systems.[1]

By its motion, the government purported to "seek[] the Court's permission to introduce into evidence the results of these [laboratory] analyses," not through the testimony of the analysts who performed the actual testing, but through the testimony of the on-site technical directors of each laboratory, Brian Herrington for Waypoint and Erica Scarbrough for MDEQ. Relying primarily on Grim v. Fisher, 816 F.3d 296 (5th Cir. 2016), cert. denied, 580 U.S. 890, 137 S. Ct. 211 (2016), the government argued preemptively that such testimony by Herrington and Scarbrough would not violate defendants' rights under the Confrontation Clause because these witnesses are "familiar with

---

[1]     In its January 29, 2024 order requesting additional briefing, the court acknowledged the government's recent assertion that in addition to Waypoint lab reports ordered by the City of Brandon officials, it was also seeking admission of several Waypoint lab reports ordered by GCC.  The court explained that it viewed the government's pending motion as limited to lab reports of samples taken in 2016 and 2017 *at the direction of state and city officials*.  Nevertheless, the court requested briefing on whether the contents of Waypoint lab reports ordered by government officials *and/or by GCC* are testimonial for confrontation purposes and whether these lab reports fit within the business records exception of Rule 803(6).  The government states in its supplemental brief that it will seek to introduce at trial the specific listed Waypoint lab reports "that were commissioned by the City of Brandon and by West Rankin Utility Authority."  No mention is made of any lab reports ordered by GCC.  From this, the court presumes the government no longer plans to introduce at trial Waypoint lab reports ordered by GCC.

their respective laboratory's testing protocols, are able to ensure that the analysts who conduct[ed] the testing did so using proper techniques, and that the results coincided with the conclusions contained in the report."

Defendant Douglas responded in opposition to the government's motion and separately moved to exclude the lab reports on the bases that they are hearsay and do not fit within any hearsay exception, and because admitting the reports through Herrington's and Scarbrough's testimony would violate the Confrontation Clause.

As the court observed in its January 29, 2024 order, the government's motion in limine was premised on an acknowledgement that the lab reports at issue are testimonial.  At the recent hearing on the outstanding motions, the government asserted to the contrary, and for the first time, that admitting evidence of the results of the lab reports would not violate defendants' confrontation rights because the reports are, instead, non-testimonial;[2] and it further argued that the reports come within the business records exception to the hearsay rule.  The court

---

[2]    The government continues to maintain that if the reports are found to be testimonial, Herrington and Scarbrough may still testify as to the results of the testing, consistent with Grim.

ordered additional briefing on these issues, which the court has now received and reviewed.

The Sixth Amendment Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. 6. Prior to the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court had interpreted the Confrontation Clause to allow the admission of out-of-court statements by an unavailable witness, so long as the statements bore "adequate 'indicia of reliability'," which the Court held were present if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). The Crawford Court overruled Roberts, rejecting the "amorphous" and "malleable standard [of reliability] [which] often fails to protect against paradigmatic confrontation violations." Crawford, 541 U.S. at 60, 124 S. Ct. 1354. The Court wrote:

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a

5

> judgment, not only about the desirability of reliable
> evidence (a point on which there could be little
> dissent), but about how reliability can best be
> determined.  Cf. 3 Blackstone, Commentaries, at 373
> ("This open examination of witnesses ... is much more
> conducive to the clearing up of truth"); M. Hale,
> History and Analysis of the Common Law of England 258
> (1713) (adversarial testing "beats and bolts out the
> Truth much better").

Id. at 61-62, 124 S. Ct. 1354.  The Court went on to announce a

revised standard that "reflected more accurately the original

understanding of the Confrontation Clause," holding that the

Confrontation Clause permits admission of "[t]estimonial

statements of witnesses absent from trial ... only where the

declarant is unavailable, and only where the defendant has had a

prior opportunity to cross-examine." Id. at 59, 124 S. Ct.

1354.  See United States v. Hamann, 33 F.4th 759, 767 (5th Cir.

2022) (explaining that Confrontation Clause is violated where a

statement by a nontestifying witness is testimonial and offered

to prove the truth of the matter asserted; that witness is

unavailable to testify; and the defendant has not had an

opportunity to cross-examine him.).

    The Court in Crawford recognized that certain kinds of

statements are testimonial, namely, prior testimony at a

preliminary hearing, before a grand jury, or at a former trial

and statements during police interrogations.  Crawford, 541 U.S.

at 68, 124 S. Ct. 1354.  Beyond that, it expressly "[left] for

another day any effort to spell out a comprehensive definition

of 'testimonial.'" Id. at 68, 124 S. Ct. 1354.  In subsequent cases, the Court has undertaken to "flesh out what it means for a statement to be 'testimonial.'" Ohio v. Clark, 576 U.S. 237, 244, 135 S. Ct. 2173 (2015).  In a pair of cases decided together in 2006, the Court "[a]nnounced what has come to be known as the 'primary purpose' test, ... explain[ing]: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  Id. at 244, 135 S. Ct. 2173 (citing Davis v. Washington and Hammon v. Indiana, 547 U.S. 813, 126 S. Ct. 2266 (2006)).  The Court has since clarified that "'whether an ongoing emergency exists is simply one factor ... that informs the ultimate inquiry regarding the "primary purpose" of an interrogation" or statement, and that other factors may also be relevant," such as "the informality of the situation and the interrogation" and whether under standard rules of hearsay the statement would be considered reliable. Id., 135 C. Ct. 2173 (citing Michigan v. Bryant, 562 U.S. 344, 377, 258-59, 131 S. Ct. 1143 (2011)).  In Melendez-Diaz v.

7

<u>Massachusetts</u>, 557 U.S. 305, 311, 129 S. Ct. 2527 (2009), the Supreme Court held that a forensic analyst's certified lab report created solely to provide evidence of the composition, quality and net weight of an analyzed substance in aid of a police investigation was testimonial.

The government bears the burden of defeating defendants' Confrontation Clause objection by establishing, by a preponderance of the evidence, that the contents of the lab reports are nontestimonial.  <u>United States v. Jackson</u>, 636 F.3d 687, 695 (5th Cir. 2011).  Despite its original position, the government now insists that the lab reports at issue are nontestimonial.  The government asserts that the reports in question are properly considered business records, and hence nontestimonial.  The government points out that these laboratories perform hundreds of wastewater analyses every year for myriad purposes, usually regulatory in nature.  It submits that the analyses that are the subject of these lab reports were performed as part of the routine business of the labs and were done, not for the purpose of establishing past facts for a criminal prosecution but for a regulatory purpose, namely, determining the constituents of the samples found in the sewer system at the request of local and state government officials in order "to respond to a potential problem."

The court recognizes that "business records are not testimonial in nature and [that] their admission at trial is not a violation of the Confrontation Clause." Jackson, 636 F.3d 687, 692 (5th Cir. 2011) (quoting United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)).  However, the lab reports at issue here are not business records solely because the work of these labs primarily involves analyses performed for regulatory purposes, unrelated to any potential criminal action.  What matters is not what they usually do but their primary purpose in conducting the analyses that are the subject of the lab reports at issue in this case.  And while the government declares that the purpose was regulatory, "to respond to a potential problem rather than to establish facts for a prosecution," it has offered nothing to support this assertion; and it is not otherwise apparent that the primary purpose was not to gather evidence for a later criminal prosecution.  In fact, the record contains evidence suggestive that the latter may well have been the primary purpose.

An October 26, 2016 memorandum prepared by MDEQ employee Tony Cox recites that during a routine inspection by the City of Brandon of the city sewer system on October 5, 2016, a brown-grease like material was observed in a manhole downstream from GCC.  A sample of the substance was evidently taken by Waypoint sampler, David Riley, at the request of the City officials/

9

inspectors and found to have a low pH.  A November 21, 2018 report prepared by MDEQ employee Laura James states that on the following day, October 6, MDEQ received a complaint from the City of Brandon about "about oily, low pH water being discharged in the sewer from [GCC]."  That afternoon, Cox and James met Brandon Mayor Butch Lee, the City's public works manager, Charles Smith, and City Attorney Mark Baker regarding "a possible illicit discharge from [GCC] into the city's collection system."  The group went to the site to further investigate what had been observed the previous day.  Riley, the Waypoint sampler, was present onsite at the request of City officials and collected samples from various locations, as directed by City officials.  Cox collected samples for MDEQ, as well.[3]  As part of their investigation, MDEQ and City officials, with permission of GCC, inspected GCC's facility and spoke with defendant Welch and his son, assistant plant manager LJ Welch.

While the court has no reason to doubt that samples collected by Riley on October 5, 2024 and sent to Waypoint for testing were part of the City of Brandon's routine maintenance and not intended or contemplated to be possible proof at a later

---

[3]     The government, in response to the court's request that it identify the lab reports it sought to have admitted, identified MDEQ lab reports of analyses of samples taken by Tony Cox in October 16.  In later submissions, it states that it seeks admission of just one MDEQ lab report, from October 2017.

criminal trial, that is not the case with the reports of the results of the analyses of samples that followed.  The samples taken on October 6 and thereafter, including those taken by MDEQ a year later at Rebel High Velocity, were not taken as part of a random or routine inspection but rather were taken as part of a targeted investigation by city and state officials of a "possible illicit discharge from [GCC] into the city's collection system."  "Illicit" is defined as "not allowed by the law."[4]  And indeed, under the Clean Water Act, it is a criminal offense "for any owner or operator of any source to operate any source in violation of any ... effluent standard or prohibition or pretreatment standard," 33 U.S.C. § 1317(d), which is precisely what officials were investigating and precisely with what defendants have been charged.  In this regard, while no evidence has been adduced to establish exactly when the EPA's Criminal Investigations Division (CID) became involved in the investigation of GCC's activities, there is evidence to show that it was involved within no more than a few weeks of the initial discovery of the suspected illegal discharge of industrial waste by GCC.  Moreover, under Brandon's city ordinances, creation of a "nuisance" is punishable as a crime

---

[4] https://www.oxfordlearnersdictionaries.com/us/definition/american_english/illicit#:~:text=illicit-,adjective,law%20synonym%20illegal%20illicit%20drugs (last accessed Feb. 4, 2024).

(albeit a misdemeanor); and the ordinance defines "nuisance" to include "[t]he pollution of any public well or cistern, stream, lake, canal or body of water by sewage, dead animals, creamery or industrial wastes or other substances."[5]

It bears repeating:  It is the government's burden to establish, by a preponderance of the evidence, that the contents of these lab reports are testimonial.  Yet despite having been given ample opportunities to do so, the government has plainly failed to meet its burden.  It may be true that a purpose of the testing and analyses of samples from and around the GCC facility had a regulatory purpose; and perhaps the immediate and primary focus of investigators was on identifying and stopping the discharges, rather than on prosecuting GCC criminally.  It may be that criminal charges were not contemplated in those early days of the investigation.  Or it also may be that there was a regulatory purpose, as claimed by the government, but there was also another purpose:  to gather evidence of GCC's suspected illegal activity for a later criminal prosecution.  The government has not established that the latter was not the

---

[5]    Brandon's city attorney was reportedly present at the meeting with City and MDEQ officials on October 6, 2016.  No evidence has been presented as to the reason for his presence, but the fact of his presence would seem to suggest that this was something other than routine regulatory sampling.

primary purpose of the investigation and the laboratory analyses performed as part of that investigation.

The court acknowledges the government's argument that the lab reports cannot be testimonial because (irrespective of what the purpose may have been) the lab analysts who performed the testing and analyses of the samples did not know the purpose of the testing; they were simply testing samples as they do day in and day out, without knowledge of or regard for the ultimate purpose of their work.  The government represents that Herrington and Scarbrough will affirm this fact in their testimony.  But Herrington and Scarbrough cannot testify as to what any analyst knew or did not know because to do so would be to engage in speculation.  At most, they could testify that analysts were not informed about the purpose(s) of their analyses; but they cannot state what the analysts may have learned from other sources.  Only the analysts can state what they did or did not know about the purpose of their analyses. And the whole point of the government's motion is to admit the results of the analyses without presenting testimony from the analysts who performed the analyses.

The court also rejects the government's recent position that the results set out in the lab reports are not statements at all, and hence not testimonial statements, because they are

simply the analysts' recordings of machine-generated numbers. See <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 661, 131 S. Ct. 2705 (2011) (rejecting argument that number registered by gas chromatograph machine called for no interpretation or exercise of independent judgment, explaining that uncalled technician "certified to more than a machine-generated number" and, "in any event, [as settled by <u>Crawford</u>,] the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar.") (quoting <u>Crawford</u>, 541 U.S. at 62, 124 S. Ct. 1354 ("obviou[s] reliab[ility]" of a testimonial statement does not dispense with the Confrontation Clause)).

Based on the foregoing, the court concludes that the lab reports which the government seeks to admit and defendants seek to exclude covering analyses of samples taken from and after October 6, 2016, are testimonial.[6]  The question thus becomes whether, without violating defendants' confrontation rights, Brian Herrington may testify to the results contained in the Waypoint lab reports and Erica Scarbrough may testify to the results in the MDEQ report.  The government's motion, in its original iteration, sought to have the court approve admission

---

[6]   The court thus concludes that the lab reports are not admissible under the business records or residual exceptions to the hearsay rule, as argued by the government.

of testimony from Herrington and Scarbrough on the contents of
the lab reports in accordance with the government's reading of
the Fifth Circuit's opinion in <u>Grim v. Fisher</u>, 816 F.3d 296.  In
the court's opinion, however, considering the government's
articulation of Herrington's connection to the testing/analyses
covered by the Waypoint lab reports, the government's position
is not supported by <u>Grim</u> and instead, is foreclosed by the
Supreme Court's ruling in <u>Bullcoming</u>.

The question presented in <u>Bullcoming</u> was "whether the
Confrontation Clause permits the prosecution to introduce a
forensic laboratory report containing a testimonial
certification—made for the purpose of proving a particular fact—
through the in-court testimony of a scientist who did not sign
the certification or perform or observe the test reported in the
certification."  564 U.S. at 652, 131 S. Ct. 2705.  The analyst
whose testimony was presented "was familiar with the
laboratory's testing procedures, but had neither participated in
nor observed the test on [the defendant's] blood sample."  <u>Id.</u>
The Court held that "surrogate testimony of that order does not
meet the constitutional requirement.  The accused's right is to
be confronted with the analyst who made the certification,
unless that analyst is unavailable at trial, and the accused had
an opportunity, pretrial, to cross-examine that particular
scientist."  <u>Id.</u>, 131 S. Ct. 2705.

15

Justice Sotomayor, one of the five justices in the
Bullcoming majority, wrote in her concurring opinion that "this
is not a case in which the person testifying is a supervisor,
reviewer, or someone else with a personal, albeit limited,
connection to the scientific test at issue." 564 U.S. at 673
(Sotomayor, J., concurring).  She expressed that "[i]t would be
a different case if, for example, a supervisor who observed an
analyst conducting a test testified about the results or a
report about such results."  Id.

In the wake of Bullcoming, courts have struggled to
determine what degree of involvement is sufficient to allow a
witness other than the actual analyst who performed the
testing/analyses to testify without violating a defendant's
confrontation rights.  Grim involved a habeas petition alleging
the defendant's confrontation rights were violated by admission
of the results of forensic testing by a witness other than the
analyst who performed the actual testing.  The testifying
witness did not perform any of the testing and did not observe
the testing; his degree of involvement was that he

> examined the analyst's report and all of the data,
> including everything the analyst did to the item of
> evidence; ensured that the analyst did the proper
> tests and that the analyst's interpretation of the
> test results was correct; ensured that the results
> coincided with the conclusion in the report; agreed
> with a reasonable degree of scientific certainty with

the examinations and results of the report; and signed
the report.

Id. at 310.  The Fifth Circuit concluded that the state court's
decision that the testimony of the reviewer did not violate the
defendant's rights under the Confrontation Clause was not an
unreasonable application of federal law, as the Supreme Court in
Bullcoming "did not clearly establish the categorical rule ...
that when the prosecution introduces a forensic laboratory
report containing a testimonial certification—made for the
purpose of proving a particular fact—the *only* witness whose in-
court testimony can satisfy the Confrontation Clause is the
analyst who performed the underlying analyses contained in the
report."  Id. at 307.

In this case, the government has purported to describe
Brian Herrington's degree of involvement with the subject
Waypoint lab reports in several offerings, including in its
motion, its argument to the court at the motions hearing and in
its supplemental brief.  Yet in all of this, the government has
not contended or undertaken to demonstrate that Herrington had
any involvement in or connection to the lab reports at issue,
apart from the fact that he occupies the position of lab
director of the Ridgeland lab where the bulk of the testing was
performed and that his initials appear on the reports.  All the

government has said about Herrington is that as Waypoint's lab
director, he was

> in a position to ensure that the lab results were
> accurate, including [being responsible] for overseeing
> the labs' testing procedures and quality control
> measures were in place.  [He was] familiar with the
> laboratory's testing protocols that ensured that the
> analyst who conduct[ed] the testing did so using
> proper techniques, and that the results coincided with
> the conclusions contained in the reports.

[Dkt. 264, at 10].  See also Transcript of Motion Hearing, Dkt.
258, at 54-55, 59-60 (stating that Herrington will describe the
lab's protocols to ensure that they have that the results are
reliable, including calibration of equipment and occasional peer
review by other members of the lab or spot-checking).  The
government points out that Herrington's initials appear as
"technical reviewer" on the lab reports and in cover letters
transmitting the reports to city officials.  Yet the government
has not demonstrated that this has any actual relevant meaning
of substance, in other words, that he did not merely rubber
stamp the analysts' work/results.[7]  The court thus concludes
that, with the exception of the October 5 lab report(s),

---

[7]     It is noted that certain of the testing covered by the lab
reports, namely Oil and Grease testing was done at the Waypoint
lab in Memphis.  Those results appear under Herrington's
initials/signature as "technical reviewer," even though
Herrington is not the director of that lab.  The government
asserts that Herrington is nevertheless qualified to testify as
to those results because he is familiar with the protocols in
place at the Memphis lab.

defendant's motion to exclude Herrington's testimony as to the contents of the Waypoint lab reports should be granted, and the government's motion to admit his testimony as to the reports will be denied.

As for Erica Scarbrough, the government has made much the same arguments for admission of her testimony based on her involvement with the MDEQ report it wants admitted as it made about Herrington's involvement in the Waypoint reports.  There is a difference, however, in that the October 2017 MDEQ report shows that it was "validated by" Erica Scarbrough.  The term "validated" has what may be a relevant meaning, namely, to "check or prove the validity or accuracy of (something)."[8]  If that is, in fact, what Scarbrough did, then to allow her testimony about the contents of the report would not violate defendants' confrontation rights.[9]  The court, however, is unsure whether or what, if anything, Scarbrough did to "validate" the results reported.  Accordingly, the court will reserve ruling on

_____

[8]    https://www.oed.com/search/dictionary/?scope=Entries&q=validate (last accessed Feb. 4, 2024).

[9]    Prior to the January 24 motions hearing, the court inquired about the meaning of this entry on the MDEQ report and directed the government to address this question at the hearing.  The government's counsel did not reference Scarbrough's "validation" of the results during the hearing, leading the court to assume the government considered it to have no relevance to the government's position.  However, in its supplemental brief, the government has pointed to Scarbrough's "validation," indicating that it is pertinent.

the pending motions as they relate to Scarbrough.  If the government establishes, outside the presence of the jury, that Scarbrough "validated" the results, she will be allowed to testify as to the contents of the report; absent such a showing, she will not.

That said, the lab report itself is hearsay and in the court's opinion, does not fit within any exception to the hearsay rule.  It cannot come in against defendants under the public records exception, see Fed R. Evid. 803(8) (covering certain statements of public office including factual findings from a legally authorized investigation when offered "against the government" in a criminal case).  In apparent recognition of this prohibition, the government instead seeks to have the report admitted under Rule 803(6) (covering records of regularly conducted activity).  This attempt is rejected.  The government may not get in through the back door what is specifically excluded by the specific hearsay exception in Rule 803(8).  See United States v. Cain, 615 F.2d 380, 381-82 (5th Cir. 1980) (error to use business record exception for escape report by federal prison; exception "does not open the back door" for evidence barred by use restriction).  Accordingly, the MDEQ lab report is inadmissible against the defendants.

As set out above, the Waypoint lab report regarding the October 5, 2016 sampling is nontestimonial hearsay, as the government has shown that it was taken for the City of Brandon's routine maintenance and not as part of a possible criminal investigation or even with a view to civil litigation.  The court thus concludes that this report may be admitted as a business record under Rule 803(6).

Based on the foregoing, it is ordered that the referenced motions are granted, denied or ruling reserved as set forth herein.

SO ORDERED this 5th day of February,

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE